**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                       )
SHEET METAL WORKERS'                   )   Civil Action No.: 10-01873(FLW)
INTERNATIONAL ASSOCIATION              )
LOCAL UNION 27,                        )
                                       )
            Petitioner,                )   **OPINION**
v.                                     )
                                       )
MAIN LINE MECHANICAL, INC.             )
AND LEONARD SANTOS,                    )
                                       )
            Respondents.               )
_____)

**WOLFSON, United States District Judge:**

Petitioner Sheet Metal Workers' International Association Local Union 27 ("Petitioner" or "Local 27") initiated this action against Main Line Mechanical Inc. ("Main Line") and its majority owner Leonard Santos ("Santos") (collectively, "Respondents") to enforce a labor arbitration award obtained against Main Line by Local 27's sister local union, the Sheet Metal Workers' International Association Local Union 19 ("Local 19").  Presently before the Court are Petitioner's petition to confirm the arbitration award, as well as Respondents' cross-motion to vacate the arbitration award.  For the reasons set forth that below, the Court confirms the arbitration award as to Main Line.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

   **1. The Parties and the Collective Bargaining Agreements**

Local 27 is a Sheet Metal Workers' International Association local labor organization with its principal office in Farmingdale, New Jersey, and is a party to a collective bargaining

1

agreement ("CBA") ("Local 27 CBA") with employers within its jurisdiction of several counties in New Jersey. The relevant Local 27 CBA covers the period June 1, 2009 to May 31, 2012. (*See* Bushinsky Cert., Ex B. at p. 1). Main Line is an employer within the meaning of the Labor Management Relations Act with an office and place of business at 228B Bristol Pike, Bristol, Pennsylvania. Respondents admit that Santos is a part owner and officer of both Main Line and Sands Mechanical, Inc. ("Sands"). Sands has an office and place of business at 228 Bristol Pike, Bristol, Pennsylvania. (*See* Bushinsky Cert., Ex. E). According to Respondents, Main Line operates in the greater Philadelphia area, which is the territory of Local 19, and Sands works "outside the territory governed by [Local 19]." (*See* Santos Aff. at ¶ 10).

Main Line is a signatory to a CBA with Local 19 ("Local 19 CBA"). The Local 19 CBA, which was signed by Main Line and Santos, was in operation from May 1, 2007 through April 30, 2010. (*See* Bushinsky Cert., Ex. E at p. 3). Local 27 has never had a contract for arbitration with Main Line. (*See* Santos Aff. at ¶ 2). The Local 19 CBA, however, includes what is known as a "traveling contractors" clause, which states in pertinent part:

> When the Employer has any work covered by this Agreement to be performed outside the area covered by this Agreement and within the area covered by another Agreement with this or another union affiliated with the Sheet Metal Workers' International Association and qualified Sheet Metal Workers are available in such area, they may send no more than two (2) Sheet Metal Workers per job into such area to perform any work which the Employer deems necessary. All additional Sheet Metal Workers shall come from the area in which the work is to be performed. . . . *and the Employer shall be otherwise governed by the established working conditions of that local Agreement*.

(*See* Santos Aff., Santos Cert., Ex. A at Article X, Section 8 at p. 11) (emphasis added). Article XII, Section 22 of the Local 19 CBA also provides:

> The Employer agrees that, when performing work in the territory of other Local Unions of the Metal Workers' International Association, the terms, conditions, and requirements of the then existing Agreement between the appropriate Local Union and Employers in that area related to Funds and as established therein shall

2

>be complied with and that failure to do so will permit the Union to take whatever action it deems appropriate to assure compliance.

(*See* Santos Aff., Santos Cert., Ex. A at p. 18).  Thus, when any signatory to a Local 19 CBA performs work in the territory of one of Local 19's sister unions, the CBA of that sister union controls the payment of wages, conditions of employment, and the remittance of fringe benefit contributions.

### 2.  The Grievance and Procedures before the Local Joint Adjustment Board

On December 29, 2009 and December 30, 2009, Local 27 business agent Brian Kamp ("Kamp") visited a job site at the Marine Corps Reserve Center & NOSC in Fort Dix, New Jersey, which is within Local 27's jurisdiction.  (*See* Bushinsky Cert., Ex. E at p. 3).  Kamp learned Main Line was allegedly performing work at the site without complying with the terms of the Local 27 CBA.  (*See Id.*).  After a third visit on January 4, 2010, to which Kamp was accompanied by Local 27 business manager Joseph W. Sykes, Jr. ("Sykes"), Kamp and Sykes met with Local 19 officials and confirmed that Main Line was signatory to the Local 19 CBA. (*See Id.*).  On January 15, 2010, Local 19 business representative Bryan Bush ("Bush") went to Main Line's offices to speak with Santos, but Santos told him, "I'll have to talk to my lawyer." (*See* Bushinsky Cert., Ex. G at p. 3).

On January 22, 2010, Sykes filed a grievance on behalf of Local 27 against Main Line and Sands with the Local Joint Adjustment Board for the Sheet Metal Industry for Central and Southern New Jersey ("LJAB"), which acts as an arbitrator.  (*See* Bushinsky Cert., Ex. E at p. 1). The grievance form filed by Sykes required that a representative of the employer be identified. The grievance form identified Santos as a president and principal of Main Line and Sands, respectively. (*See Id.*).  Main Line does not dispute receiving notice, but contends it did not respond in any way because it did not believe there was a contractual basis for the LJAB's

3

assertion of jurisdiction.  (*See* Santos Aff. at ¶ 3). Santos, however, argues that that he was not sufficiently notified as to permit him to be a named party in the present case.  (*See Id.* at ¶ 4).

The grievance alleged several violations of the Local 27 CBA: Article I – Sections 2 and 3, Article II – Sections 1, 2, and 3; and Article XXXVI – "Integrity Clause" Sections 1 and 2. (*See* Bushinsky Cert., Ex. E at p. 1).  Article I, Section 2 of the Local 27 CBA contains a list of numerous activities covered by the agreement. (*See* Bushinsky Cert., Ex. B at p. 2).  Respondents do not argue that the activities at issue fall outside that list.  Article I, Section 3 provides that "product fabricated under the terms and conditions of this Agreement, for delivery and/or installation in the in the [Local 27] jurisdiction or elsewhere," as well as any products brought into the Local 27 jurisdiction, "shall be affixed with the appropriate SMWIA Union Label."  (*See Id*.).

> Article II provides:
>
> SECTION 1.  *No Employer shall subcontract or assign any of the work described herein* which is to be fabricated or performed at a jobsite to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to Union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project.
>
> SECTION 2.  Subject to other applicable provisions of this Agreement, the Employer agrees that when subcontracting for prefabrication of materials covered herein, such prefabrication shall be subcontracted to fabricators who are in signed agreement with [Local 27] or who pay their employees engaged in such fabrication not less than the total beneficial wage scale for comparable sheet metal fabrication, as established under provisions of this Agreement.  The Employer will require that any supplier of spiral duct, double wall duct, fittings, and/or rectangular duct and fittings, will provide to them written and signed evidence of equalization of the total beneficial wage package.  The Employer will provide written evidence to the Union upon request.  Wage equalization will not be required for spiral duct and related fittings on private work.
>
> SECTION 3.  The Employer agrees that no evasion of the terms, requirements and provisions of this Agreement will take place.  In order to prevent any device or subterfuge to avoid the protection of this Agreement and in order to preserve

work, it is hereby agreed as follows: *If and when the Employer shall perform any work of the type covered by this Agreement under its own name or under the name of another*, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer through its officers, directors, partners or stock holders, exercise either directly or indirectly, (such as family members), management, control or majority ownership, *the terms and conditions of this Agreement shall be applicable to all such work*.

In the event that all the conditions set forth in the paragraph above are met but the Agreement is not deemed applicable to the non-signatory entity, the Employer shall be liable for all damages which shall include all hours of work performed outside the labor contract by employees of the other entity or company and *shall include deterrent damages which may be awarded*. All such damages shall be payable to the Union for appropriate distribution in manner consistent with the law.

(*See Id*. at pp. 2-3) (emphasis added). Article XXXVI, "Integrity Clause," provides:

SECTION 1. A "Bad-Faith Employer" for purposes of this Agreement is an Employer that itself, or through a person or persons subject to an owner's control, has ownership interest (other than a non-controlling interest in a corporation whose stock is publicly traded) in any business entity that engages in work within the hours, and working conditions are inferior to those prescribed in this Agreement or, if such business entity is located or operated in another area, inferior to those prescribed in this Agreement of the sister Local Union affiliated with Sheet Metal Workers' International, AFL-CIO in that area.

An Employer is also a Bad-Faith Employer when it is owned by another business entity as its direct subsidiary or as a subsidiary of any other subsidiary within the corporate structure thereof through a parent – subsidiary and/or holding – company relationship, and any other business entity within such corporate structure is engaging in work within the scope of Article I hereinabove using employees whose package, hours and working conditions are inferior to those prescribed in this Agreement or, if such other business entity is located or operating in another area, inferior to those prescribed in the Agreement of the sister Local Union affiliated with Sheet Metal Workers' International Association, AFL-CIO in that area.

SECTION 2. Any Employer that signs this Agreement is covered thereby by virtue of being a member of a multi-employer bargaining unit that expressly represents to the Union that it is not a Bad-Faith Employer as such term is defined in Section 1 above and further agrees to advise the Union promptly if at any time during the life of this Agreement said Employer changes its mode of operation and becomes a Bad-Faith Employer. Failure to give timely notice of being or becoming a "Bad – faith Employer" shall be viewed as fraudulent conduct on the part of such Employer.

5

> In the event any Employer signatory to or bound by this Agreement shall be guilty of fraudulent conduct as defined above, *such Employer shall be liable for liquidated damages at the rate of five hundred dollars ($500.00) per calendar day from the day of failure to notify the Union until the date on which the Employer gives notice to the Union*. The claim for liquidated damages shall be processed as a grievance in accordance with, and within the time limits prescribed by, the provisions of Article X.

(*Id*. at p. 31) (emphasis added). Article X, Section 1 provides that "[t]o be valid, grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within thirty (30) calendar days of the first knowledge of the facts giving rise to the grievance." (*Id*. at p. 11). If the matter cannot be solved through a conference, the party raising the grievance must then give a notice of appeal to the LJAB within thirty days of the termination of the procedures prescribed in Section 1. (*Id*.).

On February 1, 2010, the LJAB met to consider the grievance filed by Sykes on behalf of Local 27. (*See* Bushinsky Cert., Ex. C at p. 1). Santos is also listed as a "[p]arty [i]nvolved," together with Main Line and Sands, in the minutes of the LJAB meeting. (*See* Bushinsky Cert., Ex. E at p. 1). Main Line and Sands – but not Santos – were notified of the hearing by certified mail, facsimile, and regular mail, but neither participated. (*See Id*.). The LJAB determined that all procedural requirements had been met, that the grievance was timely, and was properly before the LJAB for consideration. (*See Id*.).

At the beginning of the LJAB meeting, Sykes reviewed the history of the Marine Corps Reserve Center project. (*See Id*. at p. 2). He stated that a settlement could not be reached with Main Line as provided in Article X, Section 1 of the Local 27 CBA. The minutes of the LJAB meeting noted:

> Employees of Main Line / [Sands] are currently working at the Marine Corps Reserve Center & NOSC in [Fort] Dix located in Burlington County, NJ[,] thus coming under the jurisdiction of [Local 27]. Main Line / Sands is the HVAC

6

subcontractor for Harkins Builders Inc., the General Contractor for the project. The charged party, [Santos], has not responded to Local 27's Request for Information concerning his company which was sent via Fax, Certified Mail and Regular Mail on January 18, 2010. On January 22, 2010, Local 27 subsequently filed a request for a [h]earing along with a copy of the Grievance Form with the [LJAB], with copies sent to [Local 19], [Main Line], and [Sands].

(*See Id.*).

Kamp ("Kamp") then provided testimony of his visits to the job site in Fort Dix, New Jersey. Kamp stated that on December 29, 2009, he "checked in" with Randall Gartner, the site manager for Harkins Builders Inc., the general contractor on the job. (*See Id.* at p. 3). Gartner informed Kamp "that [Main Line] / [Sands] was the HVAC contractor, with [Santos] as contact person, but they were not on site[,]" and then provided Kamp with Santos' contact information. Kamp continued:

> [Kamp] did find Main Line / Sands [f]oreman Tom Ponnack, who identified himself as a [Local 19] [m]ember. Ponnack admitted that he had not called in to Local 27's Hall as required when performing work in another Local's jurisdiction. Ponnack could not produce a valid Union Dues Receipt, but said that he would have it with him the next day. Before leaving the job site [Kamp] observed a delivery truck from Ductworks Inc., a non-union duct fabricator located at 434 W. Front St. in Plainfield, NJ, dropping off a load of duct for [Main Line] / [Sands]. The truck was unloaded by Ponnack and four other unidentified employees of Main Line / Sands.
>
> [Kamp] made a return visit to the job site the next day, 12/30/09. Ponnack was again unable to present a valid Union Dues Receipt. Brian then contacted [Sykes] to discuss the situation and to schedule a job site visit.

(*See Id.*).

Sykes then provided the following testimony:

On 1/4/10 [Sykes] accompanied [Kamp] on a job site visit. [Sykes] questioned Ponnack whether he was working for [Sands] or [Main Line] and Ponnack stated "[Main Line] and [Sands] are one in the same company." They asked if [Main Line] is signatory to [Local 19] and Ponnack replied "Yes." [Sykes] gave his business card to Tom Ponnack and requested that he have [Santos] call him. Another Main Line / Sands sheet metal worker they questioned indicated that he was making more than the [p]revailing [w]age [r]ate but he wasn't worried about

7

> any benefits. A Main Line / Sands plumber asked [Sykes] and [Kamp] about what benefits he should be receiving. [Sykes] indicated that at the job site all equipment, ladders and gang boxes were marked "Main Line Mechanical." Rich Cattone, identifying himself as a [Sands] [f]oreman, requested that [Sykes] and [Kamp] stop interfering with his men. At that point [Sykes] and [Kamp] were asked by two Harkins' employees to report to Harkins' job trailer and they were then asked to leave the job site by Randall Gartner, Harkins' Site Manager.

(*See Id.*)

Sykes detailed the meeting he and Kamp had with Local 19 officials on January 8, 2010, during which it was verified that Main Line was a signatory to the Local 19 CBA, and that Sands was not. (*See Id.*). Sykes and Kamp were provided with copies of the cover sheets and the signature page of the Local 19 CBA, "both signed by [Santos] of [Main Line]." (*See Id.*). Sykes stated that "an acceptable resolution was proposed during the 1/8/10 meeting with Local 19 official." (*See Id.*). The resolution would require Main Line's work force to consist of two Local 19 members in good standing, with the remaining crew coming from Local 27's referral list, and that all duct would be fabricated at a union signatory shop at Local 27's current rate of pay. (*See Id.*). Local 19 agreed to take the resolution to Main Line, but as of the February 1, 2010 hearing date, Local 27 had received no response to the proposed resolution. (*See Id.*). Local 19 officials also told Local 27 representatives that Tom Ponnack, the foreman on the job, had been suspended from Local 19, and thus was not in good standing. (*See Id.* at p. 4).

Local 27 introduced several pieces of evidence to the LJAB: the cover sheets and signature pages of the Local 27 CBA that contain Santos' signatures; the Local 27 CBA to which Mine Line is a signatory; the New Jersey public works contractor registration filed by Sands that shows Santos as 70% owner and president of Sands; a job listing from Construction Data Company detailing the Fort Dix project and identifying Harkins Builders Inc. as the General Contractor; the Local 19 CBA's integrity clause and articles addressing subcontracting; a

8

business listing for Sands which identifies Santos as the principal, and contains the same address, phone number, and fax number for both Main Line and Sands; a corporate information document from the Pennsylvania Department of State establishing Santos as Main Line's president; "Local 27's Request for Information to [Santos] and [Main Line] dated January 18, 2010 [which] was sent via Certified Mail, Regular Mail, and Fax to insure compliance with the [Local 27 CBA][;]" and "an estimate of lost wages and benefits on the project based on a Local 27's contractor's bid to Harkins." (*See Id*. at pp. 3-5). The estimate listed "[t]otal shop hours" at 972.48, and "[t]otal field hours" at 2,428.97, with the total hours being 3,401.45. At a "[t]otal [p]ackage" of $71.47 per hour, the estimate stated that Local 27 members had lost wages and benefits in the amount of $243,101.62. (*See Id*. at p. 4).

A LJAB member asked if the company on the job site was Sands or Main Line. Sykes stated that contract documents between Harkins and Main Line / Sands were not able to be obtained through an open public records request. (*See Id*.). In response to a different question, Sykes explained that while Fort Dix takes no stance on union or non-union contractors, Main Line was still required to fabricate at a union shop under both the Local 27 CBA and Local 19 CBA. (*See Id*.) Sykes explained that "[Main Line] is a Local 19 Signatory Contractor … [and thus] Main Line would be obligated to fabricate the duct at Local 27 wage rates, where the job is located, and would be obligated to install the duct with card-carrying sheet metal workers." (*See Id*.). Other LJAB members asked questions, which Kamp and Sykes answered.

> Q: How far has the project progressed?
> A: The main building is 25% roughed in. The project is scheduled for completion by August 2010.
> Q: What are the differences between Local 27's and Local 19's Integrity Clauses?
> A: They are similar.
> Q: Are we sure that the shop hours would have gone to a Local 27 contractor?

9

> A: Yes. [Sykes] stated that the bid for the mechanical part of the job was due June 26, 2009. Harkins was awarded the project contract in August 2008. A Local 27 signatory shop who bid on the project would have been awarded the mechanical part of the job if Main Line had not used their non-union company [Sands] for pricing their bid.
> Q: How is Local 19 handling [Main Line]?
> A: At this time Local 27 has no knowledge of a grievance being filed by Local 19.
>
> . . .
>
> Q: What damages can the [LJAB] seek?
> A: Local 27's CBA Article II, Section 3 allows for deterrent damages. Article XXXVI "Integrity Clause" Section 2 allows for liquidated damages of $500/day, which would start on December 29, 2009.

(*See Id*. at p. 5).

### 3. The LJAB Finds Main Line in Violation of the Local 27 CBA

The LJAB then held their vote on the charges against Main Line. (*See Id*.). All LJAB members found Main Line had violated Article I, Sections 2 and 3; Article II, Sections 1, 2 and 3; and Article XXXVI, "Integrity Clause" Sections 1 and 2 of the Local 27 CBA. (*See Id*.). Three separate motions were then made, seconded, and unanimously approved, finding that Local 27 was entitled to $243,101.62 in lost wages and benefits; $24,310.16 in deterrence damages as provided for in Article II, Sectiofn 3; and, as provided in Article XXXVI, "Integrity Clause" Section 2, liquidated damages of $500 per calendar day from December 29, 2009 forward, which was $16,500 as of the day of the meeting. (*See Id*. at pp. 5-6). In its February 17, 2010 decision, the LJAB found that Main Line, "being a [Local 19] [s]ignatory [c]ontractor with [Santos], President, [had] subcontracted [Sands], a non-signatory [c]ontractor with [Santos], [p]rincipal, for work being done at the Marine Corps Reserve Center & NOSC at Fort Dix, NJ[,]" and thus had violated the above articles of the Local 27 CBA. (*See* Bushinsky Cert., Ex. C at p. 1). The LJAB concluded its decision by quoting language from Article X, Section 3 of

the Local 27 CBA, which provides, "Except in the case of a deadlock, a decision of a [LJAB] shall be final and binding."[1] (*See Id*. at p. 2).

### 4. **The Present Case**

On April 13, 2010, Petitioner initiated this action to confirm the LJAB's arbitration award. (*See* Pet'r's Pet. To Confirm at ¶ 11). In addition to seeking the award of $243,101.62 of lost wages and benefits and $24,310.16 of deterrent damages, Local 27 is also seeking liquidated damages "of $500.00 per calendar day from December 29, 2009 forward to the return date of this [m]otion in the amount of $63,000.00 and interest in the amount of $19,448.12 through the return date of this [m]otion, continuing until [Main Line] is in compliance." (*See Id.* at ¶ 10). In total, Local 27 seeks the entry of a judgment in the sum of $349,859.90, as well as reasonable attorney's fees and costs pursuant to 29 U.S.C. §§ 1132(g)(2) and 502(g) of the Employee Retirement Income Security Act of 1974 ("ERISA"). (*See Id*. at ¶¶ 10, 12). On May 3, 2010, Respondents filed an answer to the petition (*See* Resp't's Answer), in which they assert eleven separate defenses, as well as an affidavit of Santos (*See* Santos Aff.) and a brief in opposition to the petition (*See* Opp'n Br.). On June 8, 2010, Petitioner's filed a reply brief. (*See* Pet'r's Br.) On June 24, 2010, Respondents filed a sur-reply brief. (*See* Resp't's Reply Br.). Respondents also filed a cross-motion to vacate the arbitration award on June 24, 2010. (*See* Resp't's Cross-Motion). On July 28, 2010, Petitioner filed a letter brief in opposition to the cross-motion to vacate. (*See* Pet'r's Cross-Motion Opp'n Letter Br.). On August 3, 2010, Respondents filed a reply brief to Petitioner's brief in opposition to the cross-motion to vacate. (*See* Resp't's Cross-Motion Reply Br.). For the reasons that follow, Petitioner's petition to confirm the arbitration

---

[1] The LJAB mistakenly cited Article X, Section 2 as the source of the language. (*See* Bushinsky Cert., Ex. C. at 2).

award is granted as to Main Line, but denied as to Santos; Respondents' cross-motion to vacate is denied.[2]

## II. STANDARD OF REVIEW

When parties to a CBA agree to settle a dispute through arbitration, the Court's review of the resulting decision of the arbitrator is "extraordinarily limited." *See Dauphin Precision Tool v. United Steelworkers of America*, 338 Fed. Appx. 219, 222 (3d Cir. 2009) (citing *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)). "We do not review the merits of the decision or correct factual or legal errors." *Id*. (citing *Garvey*, 532 U.S. at 509; *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 279 (3d Cir. 2004)). Rather, this Court "must enforce an arbitration award if it is based on an arguable interpretation of the collective bargaining agreement, and we may only vacate an award if it is entirely unsupported by the record or if it reflects a 'manifest disregard' of the agreement." *Id.* at 222-23 (quoting *Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1291 (3d Cir. 1996) (quoting *News Am. Publ'ns, Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990)). In other words, unless the "arbitrator's decision is wholly unsupported by the agreement's plain language or the arbitrator fails to adhere to basic principles of contract construction[,]" a court is not permitted to overturn that decision. *Cacace Associates, Inc. v. Southern New Jersey Bldg. Laborers Dist. Council*, No. 3:07-cv-5955-FLW, 2009 WL 424393, *3 (D.N.J. Feb. 19, 2009) (citing *News Am. Publications, Inc., Daily Racing Form Div. v. Newark Typographical Union, Local 103*, 921 F.2d 40, 41 (3d Cir. 1990); *Exxon Shipping*

---

[2] Respondents argue that Petitioner has failed to allege or show a basis for federal court jurisdiction. (*See* Resp't's Cross-Motion Reply Br. at 5). The Court disagrees. Petitioner has properly demonstrated that this Court has subject matter jurisdiction over this suit pursuant to Section 502(e) and (f) of the ERISA, as well as under Section 301 of the National Labor Relations Act, 29 U.S.C. § 184 *et seq*. Based on the Court's jurisdiction, it may confirm the arbitration award pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9.

*Company v. Exxon Seamen's Union*, 801 F.Supp. 1379, 1384 (3d Cir. 1992)).  This Court's obligation is to "uphold an arbitrator's judgment if the decision, on its face, was drawn from the parties' agreement or is remotely based on reasonable contractual interpretation." *Id*. (citing *United Trans. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995).

However, when examining the arbitrability of an issue, a court should not give deference to the arbitrator's decision, and instead should "independently review the agreement" and "exercise plenary review to determine whether the matter is arbitrable." *See International Union of Bricklayers And Allied Craftworkers, Local 5 v. Banta Tile & Marble Co., Inc.*, 344 Fed. Appx. 770, 772 (3d Cir. 2009) (quoting *McKinstry Co. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 16*, 859 F.2d 1382, 1385 (9th Cir. 1988) (citation omitted)); *see also U.S. Small Business Admin. v. Chimicles*, 447 F.3d 207, 209 (3d Cir. 2006) (stating that whether a party has agreed to arbitrate is a legal question which requires plenary review).  Additionally, "where one of the parties seeking arbitration is not a signatory to the underlying agreement, a further step is added to the inquiry. Before the presumption of arbitrability can apply, the non-signatory party must show that the signatories intended it to derive benefits from the agreement."  *Id*.  (quoting *McKinstry*, 859 F.2d at 1384).  When the non-signatory shows such intent, and "where the arbitration clause is susceptible to the interpretation that the non-signatory has the right to enforce these benefits, then arbitration is proper." *Id*. (quoting *McKinstry*, 859 F.2d at 1384-85).

### III. DISCUSSION

Local 27 seeks confirmation of the LJAB's arbitration award, as well as additional liquidated damages and attorney's fees and costs.  Respondents raise several defenses to the enforcement of the arbitration award, including that the matter was not properly the subject of arbitration because no contract for arbitration existed between Respondents and Local 27, that

judgment should not be entered against Santos because he was not made a party to the arbitration and no award was entered against him, and that the grievance was untimely because "the facts upon which the grievance is based were known to [Local 27] far in excess of 30 days prior to the filing of the grievance."  (*See* Santos Aff. at ¶ 5).

### A. The Local 27 CBA's Traveling Contractors Clause is Clear and Unambiguous and Requires Main Line, When Working Within Local 19's Jurisdiction, to Comply with the Terms of the Local 19 CBA.

Local 19 brought the dispute before the LJAB by invoking the grievance and arbitration provisions of the Local 19 CBA.  Main Line is not a signatory to the Local 19 CBA, and argues that Local 19 had no right to bring the dispute.  However, traveling contractors clauses, which are included in CBAs to confer rights to unions that are not parties to the agreement containing the clause, are common in the construction industry.  *See International Union of Bricklayers and Allied Craftworkers, Local 5 v. Banta Tile & Marble Co., Inc.*, 344 Fed. Appx. 770, 774 (3d Cir. 2009) (*citing McKinstry*, 859 F.2d at 1389); *Trustees of the National Automatic Sprinkler Industry Pension Fund v. Fairfield County Sprinkler Company*, 243 F.3d 112, 116 (2d Cir. 2001)).  The Third Circuit recently analyzed the applicability of traveling contractors clauses to arbitration procedures brought by a plaintiff that did not have a CBA with the defendant in *Banta Tile*, 344 Fed. Appx. at 774-75.  *Banta Tile* is very similar to the facts of this case, and support this Court's decision that it was wholly proper for the LJAB to hear and adjudicate the merits of Local 27's grievance against Main Line.

In *Banta Tile*, the defendant, a tile installation company, had terminated its CBA in 2006 with plaintiff Local 5, a Bricklayers and Craftworkers ("BAC") local union representing tile workers within its jurisdiction.  *Id.* at 771. The defendant remained a signatory to a CBA between an association of tile contractors and another BAC local union, Local 1.  *Id.*  In 2004, a

successor agreement – which contained a traveling contractors clause and was binding on the defendant – was negotiated between the association and Local 1. *See Id*. The traveling contractors clause required signatory employers "to comply with the terms of any other Bricklayers Local Union standard agreement when [sending] union members outside the Philadelphia area to work." *Id*. at 771. Approximately one month after the CBA between the defendant and Local 5 had been terminated, Local 5 discovered that employees of the defendant were working in its jurisdiction. *Id*. Thereafter, Local 5 filed a grievance alleging the defendant had violated the traveling contractors clause found in the Local 1 CBA, which led to an arbitration that concluded in Local 5's favor. *See Id*. The defendant attempted to avoid enforcement of the arbitration award by claiming that Local 5 had impermissibly invoked the terms of its own CBA, which had previously been terminated. *See Id*. at 772.

A district court granted summary judgment to Local 5, and the defendant appealed. *See Id*. The *Banta Tile* court, in affirming the district court's ruling, predominately relied on *McKinstry*, 859 F.2d at 1386.

> In *McKinstry*, the Ninth Circuit held that a "traveling contractors" clause, similar to the one at issue in this case, "was clearly intended to extend certain direct and indirect benefits to workers other than those represented by [the local union which was the signatory]." Accordingly, the Ninth Circuit held that a sister, non-signatory union, such as Local 5 in this case, could bring a grievance against the employer that had operated outside the area governed by the agreement.

*Id*. at 774 (citations omitted). The court explained that Local 5 had shown that "the agreement was clearly intended to convey benefits to unions besides those who were represented by the union which signed the agreement[,]" and thus Local 5, even though it was a non-signatory party to the CBA between Local 1 and the defendant, was permitted to invoke its own CBA's arbitration clause. *Id*. at 775.

Here, the same result follows. The traveling contractors clause of the Local 19 CBA dictates that signatory employers, when performing work that requires more than two sheet metal workers "within the area covered by another Agreement with this or another union affiliated with the Sheet Metal Workers' International Association . . . shall be otherwise governed by the established working conditions of that local Agreement." Further, the agreement also requires signatory employers, when performing work in the territory of one of Local 19's sister unions, comply with the "terms, conditions, and requirements" of the agreement between that sister union and employers in that jurisdiction. Main Line agreed to be bound by the terms of the Local 19 CBA, which clearly and unambiguously states that the CBAs of Local 19's sister unions control when Main Line performs work in their jurisdictions. As in *Banta Tile*, here the Local 27 CBA's traveling contractors clause was clearly meant to confer benefits upon its sister unions. Therefore, because Main Line was working in Local 27's jurisdiction in violation of the Local 19 CBA, it was proper for Local 27 to invoke the grievance and arbitration clauses of its own CBA.[3]

### B.   The Grievance Procedure was Properly Followed

Respondents assert that the LJAB "lacked jurisdiction according to the terms of the contract because [Local 27] had knowledge of the facts concerning the allegation of alter ego long before thirty days prior to the filing of the grievance." (Resp't's Answer at p. 4-5). The Local 27 CBA requires grievances to be raised "within thirty (30) calendar days following the occurrence given rise to the grievance, or if the occurrence was not ascertainable, within thirty (30) calendar days of the first knowledge of the facts given rise to the grievance."  (*See*

---

[3]   Petitioner argues that Respondents' cross-motion to vacate arbitration award was "procedurally untimely and substantively deficient." (*See* Petitioner's Cross-Motion Opp'n Letter Br. at 1). As a result of this Court's ruling to confirm the arbitration award at issue, *see supra*, the timeliness of Respondents' cross-motion need not be addressed.

Bushinsky Cert., Ex. B at Article X, Section 1 at p. 10). If the grievance is not able to be settled between the employer and the union, submission to the LJAB must follow within the next thirty calendar days. (*See Id*. at Article X, Section 2 at p. 10).

Respondents have presented no evidence that Local 27 had evidence of Main Line's connection to the job at Fort Dix before Sykes visited the job site on December 29, 2009. Without presenting this evidence, it is clear to the Court that the grievance procedure was properly followed. Approximately two weeks after Sykes' job site visit, a representative of Local 19 went to Main Line's offices to attempt to speak with Santos, who stated, "I'll have to talk to my lawyer." Local 19 then filed a proper grievance on January 22, 2010, and having given notice to Main Line, the LJAB met to consider the grievance approximately one week later. With no contrary evidence submitted by Respondents, the timing of the grievance and the submission for arbitration by Local 19 were both proper based on the record before the Court.

### C. The Imposition of Liquidated Damages was Proper

While Respondents argue that there is no provision in the Local 19 CBA that provides for the imposition of liquidated damages, the Local 27 CBA does provide for the imposition of "liquidated damages at the rate of five hundred dollars ($500.00) per calendar day from the day of failure to notify the Union until the date on which the Employer gives notice to the Union." (Opp'n Br. at p. 4). In accordance with this provision, the LJAB concluded that Main Line was liable for liquidated damages. For the same reasons that the traveling contractors clause permitted Local 27 to file a grievance, it was proper for the LJAB to enforce the liquidated damages provision of the Local 27 CBA.

### D.       Respondents' Failure to Appear before the LJAB

Having determined that the issue was properly before the LJAB, the Court addresses Respondents' attacks on the substantive decision of the LJAB.  Respondents argue that Main Line had no connection to the job being performed at Fort Dix, did not subcontract the Fort Dix work to Sands in any part, and did not employ any labor in connection with the Fort Dix project. Further, Respondents assert that Main Line is not the alter ego of Sands Mechanical, and outlines how the companies are dissimilar.  Even if Respondents' assertions are correct, our review of this issue is extraordinarily limited and does not include the ability to correct factual errors. These are all issues that should have been argued before the LJAB.  *See, e.g., Teamsters Local Union No. 764 v. J.H. Merritt and Co.*, 770 F.2d 40, 42-43 (3d. Cir. 1985) (citing *Meat Cutters Local 195 v. Cross Brothers Meat Packers, Inc.*, 372 F.Supp 1274, 1276 n. 2 (E.D. Pa. 1974)) ("This court has recognized the principle that a party way wave its right to raise on appeal an objection to the decision of arbitrator when the party failed to address the objection before the arbitrator in the first instance.); *National Wrecking Co. v. International D.H.D. of Teamsters, Local 731*, 990 F.2d 957, 960-961 (7th Cir. 1993) ("[F]ailure to present an issue before an arbitrator waives the issue in an enforcement proceeding.").

In light of the evidence before the LJAB and the language of the Local 27 CBA, the LJAB determined that Main Line, a company owned by Santos, had impermissibly subcontracted craftwork and work to be performed at Fort Dix to Sands, a company also owned by Santos, that was also not a signatory to the Local 27 CBA.  Thus, the LJAB determined that Main Line was responsible for lost wages and damages, deterrent damages, and liquidated damages, all of which were permitted by the Local 27 CBA.  The LJAB's decision was appropriate.

### E. Santos was not a Party to the Arbitration and Should not have been Named as a Respondent

While Santos was named as president and principal of Main Line and Sands, respectively, on the grievance form filed by Local 27, the LJAB's award was entered against Main Line only. The LJAB found Main Line "jointly, severally and in the alternative responsible to pay fair and justifiable compensation to [Local 27] for lost wages and benefits in the amount of $243,101.62 . . . as well as [d]eterrent [d]amages of $24,310.16 and [l]iquidated [d]amages of $500 per calendar day from December 29, 2009, forward, continuing until [Main Line] is in compliance." Local 27 has had the opportunity to respond to Santos' argument that he should be a named party in the lawsuit, and they have not addressed the issue. It is clear that Santos, who was not ordered to pay any of the damages and appears to have never agreed to do so, cannot be held liable for this award. Thus, the Court's confirmation of the arbitration award is binding only on Main Line.

### F. Attorney's Fees are Warranted

In addition to an order confirming the arbitration award, Petitioner seeks reasonable attorney's fees and costs. Petitioner is entitled to these fees as both a matter of law and contract. Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(2), authorized awards of attorney fees and costs in any action "in which a fiduciary seeks delinquent fund contributions." *See Sheet Metal Workers Local 19 v. Keystone Heating and Air Conditioning*, 934 F.2d 35, 39 (3d Cir. 1991); *Local 478 Trucking and Allied Industries Pension Fund v. Jayne*, 778 F.Supp 1289, 1327 (D.N.J. 1991) (citations omitted) (explaining that under § 1132(g)(2), an "[a]ward of … reasonable attorney's fees is mandatory, not discretionary."). Additionally, Petitioner is entitled to reasonable attorney's fees and costs pursuant to Article X, Section 6 of the Local 27 CBA, which provides in pertinent part:

> In the event of non-compliance within thirty (30) calendar days following the mailing of a decision of a [LJAB] . . . a local party may enforce the award by any means including in a court of competence jurisdiction[.] . . . If the party seeking to enforce the award prevails in litigation, such party shall be entitled to its costs and attorney's fees in addition to such other relief as is directed by the courts.

(*See* Bushinsky Cert., Ex. B at p. 12). It has been more than thirty days since the LJAB made its decision, and Main Line by its own admission has not complied. Thus, Local 27 is entitled to attorney fees. *See McKinstry*, 859 F.2d at 1390 (where CBA did not specify that only the signatory union could receive attorneys fees, but instead "authorize[d] fee awards to a prevailing 'local party[,]'" it was proper for district court to find that the non-signatory union plaintiff was entitled to fees under the CBA). Pursuant to L. Civ. R. 54.2, no later than 30 days from the date of the Order accompanying this Opinion, Petitioner shall submit its fee application.

## IV. CONCLUSION

Based on the foregoing, Petitioner's petition to confirm the arbitration award in the amount of $349,859.90 is granted, as is Petitioner's request for attorney's fees. Both judgments are to be entered only against Main Line. Consequently, Respondents' cross-motion to vacate arbitration award is denied.

An order will be entered consistent with this Opinion.

s / Freda L. Wolfson  
Freda L. Wolfson  
United States District Judge

Dated: October 25, 2010